# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JANENE DUFFEY,

                  Plaintiff,

v.

TONY & JOE'S SPECIALTY HOMES, INC., a
Michigan corporation, *et al.,*

                  Defendant.
_____ /

Case Number: 04-73712

JUDGE PAUL D. BORMAN
UNITED STATES DISTRICT COURT

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO APPOINT RECEIVER TO MANAGE AND GOVERN THE OPERATION OF TONY AND JOE'S SPECIALTY HOMES, INC., DURING LITIGATION

Now before the Court is Plaintiff Janene Duffey's Motion to Appoint Receiver to Manage and Govern the Operation of Tony and Joe's Specialty Homes, Inc. During Litigation. At the hearing, the Court granted, from the bench, Plaintiff's motion for the appointment of a receiver, pursuant to Federal Rule of Civil Procedure 66. This opinion and order sets forth, in greater detail, the Court's reasoning underlying that ruling.

### I. FACTS

Janene Duffey ("Plaintiff") and Defendants Anthony Sacco, Giuseppe Cangialosi, and Antonio Cangialosi are shareholders of Defendant Tony & Joe's Specialty Homes, Inc.

("Specialty Homes").[1]  (Stock Issuance Agreement, Compl. Ex. A at 2.)  On September 23, 2004, Plaintiff filed suit against Specialty Homes; Casa Development, Inc. ("Casa"); Fortuna of Michigan, Inc.; Somerset Park of Monroe, L.L.C.; Anthony and Mary Sacco; Giuseppe, Antonio, and Barbara Cangialosi; and Thomas Pugno (collectively "Defendants").  Pleading various state-law claims, Plaintiff's complaint, in essence, argues that Defendants, whether via a conspiracy or otherwise, misappropriated and/or converted Specialty Homes' business opportunities, funds, and assets for their personal gain, and have unlawfully and fraudulently excluded Plaintiff from participating in or benefitting from Specialty Homes' business opportunities.  Pursuant to 28 U.S.C. § 1332, the Court has jurisdiction over the action based upon diversity of citizenship.

On January 21, 2005, Plaintiff filed a motion for the appointment of a receiver to manage Specialty Homes pending the resolution of her lawsuit.  Defendants, on February 7, 2005, filed a response objecting to such a receivership.  On February 18, 2005, the Court held a hearing on Plaintiff's receivership motion, at which hearing the Court heard oral argument and took evidence.  Only Plaintiff testified.  Upon finding the requisite need for the appointment of a receiver to manage Specialty Homes, the Court orally granted Plaintiff's receivership motion.  During a telephone conference on February 22, 2005, in which conference all parties participated, the Court appointed David W. Allard ("Allard") as the receiver.  The Court issued an Order Appointing Receiver the following day.

As noted above, this opinion and order elaborates upon the Court's reasoning in granting Plaintiff's motion for the appointment of a receiver.

---

[1] Specifically, Plaintiff has a 15% interest while each of the other shareholders has a 28 1/3 % interest. (Stock Issuance Agreement, Compl. Ex. A at 2.)

## II.  ANALYSIS

A district court has both the power and the discretion to appoint a receiver in a matter pending before it.  Fed. R. Civ. Pro. 66; *Guy v. Citizens Fidelity Bank & Trust Co.,* 429 F.2d 828, 833-34 (6th Cir. 1970).  Pursuant to their general equity powers, federal courts frequently appoint receivers "as an incident to a stockholder suit to prevent the impairment of corporate assets."  12 Wright & Miller, *Federal Practice and Procedure* § 2983 at 22-23 (1973).  As the United States Supreme Court recognized, the appointment of a receiver to manage a corporation may be necessary "to prevent [the] threatened diversion or loss of [corporate] assets through [the] gross fraud and mismanagement of its officers."  *Burnrite Coal Briquette Co. v. Riggs,* 274 U.S. 208, 212 (1927); *see Macon Lumber Co. v. Bishop,* 229 F.2d 305, 307 (1956) (affirming, in a stockholder suit, the appointment of a receiver to manage the corporation where it became impossible to accomplish the purposes for which the corporation was organized and where the corporate assets were threatened with irreparable injury, loss, or destruction).  However, "the appointment of a receiver is . . . an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect [the] plaintiff's interests in the property."  12 Wright & Miller, *Federal Practice and Procedure* § 2983 at 24 (1973).

In determining whether the requisite necessity exists to appoint a receiver, a district court may consider such relevant factors as:  1) whether the defendant engaged in fraudulent conduct; 2) whether there is a risk of irreparable injury to the plaintiff's interest in the property–i.e. whether there exists "an imminent danger of the property being lost, concealed, injured, diminished in value, or squandered"; 3) whether the legal remedies available to the plaintiff would be inadequate; 4) whether the harm to the plaintiff from the absence of a receivership would outweigh the harm to the plaintiff's opponents from the receivership; and 5) the plaintiff's

likelihood of success on the merits. *See* 12 Wright & Miller, *Federal Practice and Procedure* § 2983 at 25-26 (1973). The need to protect, conserve, and administer property pending the final disposition of a lawsuit is a chief consideration in determining whether to appoint a receiver in a lawsuit. *See Gordon v. Wash.,* 295 U.S. 30, 37 (1935).

### A. Defendants' Fraudulent Conduct

The parties principally dispute whether Defendants engaged in any fraudulent conduct. Plaintiff alleges that Defendants competed with Speciality Homes in its business of real-estate construction, thereby excluding Plaintiff from participating in or benefitting from those business opportunities. (Mot. at 3; Compl. at ¶ 21.) Plaintiff also alleges that Defendants used Specialty Homes' assets and funds for personal gain as well as to finance such competition.[2] (*Id.*)

### 1. Misappropriation of Corporate Opportunities

The parties agree that Specialty Homes constructed residential dwellings. (Mot. at 2; Resp. at 6.) In fact, Plaintiff, as a licensed realtor, marketed and sold certain houses that Specialty Homes constructed, and received a commission rate for such sales. (Mot. at 3; Compl. at ¶¶ 17-18; Compl. Ex. C; Resp. at 5.) Plaintiff maintains that Defendants have competed in residential projects, including those belonging to Specialty Homes, under companies other than Specialty Homes. (Mot. at 4.) In particular, Plaintiff maintains that, on April 21, 2003,

---

[2]Plaintiff also contends that Defendants competed with Speciality Homes in its business of real-estate development, thereby excluding Plaintiff from participating in or benefitting from those business opportunities, and used Specialty Homes' assets and funds to finance such competition. (Mot. at 2-3; Compl. at ¶ 16.) Defendants, in turn, assert that Specialty Homes was formed only to construct residential homes, not to engage in any real-estate development. (Resp. at 4.) Defendants further assert that, consequently, they could not have competed with Specialty Homes in the business of real-estate development.

The Court finds sufficient evidence that Defendants competed with Specialty Homes in its business of real-estate construction. Thus, the Court need not and does not address whether Defendants also competed with Specialty Homes in real-estate development.

Defendants Cangialosi and Sacco, with Defendant Pugno's aid, formed Defendant Casa, a real-estate company, to compete with Specialty Homes in its business of real-estate construction and to exclude Plaintiff, via Specialty Homes, from that business. (*Id.* at 3.)

The Michigan Court of Appeals has held:

> A corporate officer or director is under a fiduciary obligation not to divert a corporate business opportunity for his own personal gain. The Rule is that if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake which is, from its nature, in the line of the corporation's business and is of practical advantage to it, and which is one in which the corporation has an interest or a reasonable expectancy, and if, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of this corporation, the law will not permit him to seize the opportunity for himself.

*Prod. Finishing Corp. v. Shields,* 158 Mich. App. 479, 485-86 (1987).

Plaintiff testified that Specialty Homes, along with Jim Macken, were the exclusive builders in Cypress Pointe Estates ("Cypress"), an 87-home residential subdivision that is southwest of Monroe, Michigan. (2/18/05 Tr. at 44; Compl. at ¶ 22.) Indeed, Defendants concede that Specialty Homes constructed houses in Cypress. (Resp. at 4). Plaintiff testified that Defendant Casa, a competitor in the real-estate construction business, has marketed certain houses in Cypress that Specialty Homes constructed, and that signs in front of such houses that once advertised Specialty Homes now advertise Casa. (2/18/05 Tr. at 13, 45.) For example, Plaintiff testified that the sign in front of Lot 45 in Cypress, 498 Birdie Court, which house Specialty Homes built, advertised Casa, not Specialty Homes. (*Id.* at 19, 53-55.) Plaintiff further testified that Casa advertises a model home in Cypress under the name of Casa even though Specialty Homes has paid for it. (*Id.* at 13, 65.)

Of special note, Plaintiff testified that, upon calling Specialty Homes' contact number, as

5

set forth in advertisements for Specialty Homes,[3] the answering machine identifies the number as belonging to Casa.  (Feb. 18, 2005, Tr. at 8, 15, 17, 21, 50; Pl.'s Exs. 6, 9.)  Moreover, Casa's letterhead identifies that phone number as its own.  (Pl.'s Ex. 7.)  Thus, anyone seeking to hire Specialty Homes as a builder is directed to Casa, a competing builder.

Plaintiff maintains that Defendants, under Casa's name, misappropriated Specialty Homes' corporate opportunities in Orchard Meadows, a planned 68-lot residential development on Dunbar Road in Monroe, Michigan.  (Compl. Ex. F)  Indeed, Defendants concede that Defendant Giuseppe Cangialosi constructed houses in the Orchard Meadows project. (Resp. at 7.)  Defendants cursorily contend, however, that Specialty Homes lacked the financial capital or resources to participate in other real-estate projects.  (*Id.* at 6.)  Yet, Plaintiff testified that there was no reason why Specialty Homes would have been unable to construct other houses.  (2/18/05 Tr. at 32.)  In fact, Plaintiff established that, during the relevant time period, Specialty Homes had at least 1.2 million dollars at its disposal with which to pursue business opportunities.  (*Id.* at 70-71; Pl.'s Ex. 11.)  Moreover, Defendants themselves maintain that Specialty Homes is "very solvent."  (2/18/05 Tr. at 72.)

### 2. Conversion of Specialty Homes' Funds or Assets

According to Plaintiff, Defendants have misappropriated Specialty Homes' funds for personal expenditures.  (Mot. at 5; Mot. Ex. A)  Plaintiff notes that, between April and August of 2002, Specialty Homes paid over $15,000 to St. Michael's Catholic Grade School in Monroe, Michigan, which school Defendants Cangialosi's children attend.  (Mot. at 5; Mot. Ex. A)

---

[3]For example, Plaintiff testified that both the billboard for Baldwin Place, a residential subdivision in Monroe County, Michigan, and a real-estate web site–www.newandnow.net–list Specialty Homes' contact number for the houses that Specialty Homes built.  (2/18/05 Tr. at 20, 50, 56; Pl.'s Exs. 6, 9)

Defendants disclaim that this payment was for the children's tuition.  Defendants assert, however, that the money was for Runyon Carpet, a local tradesman, and that Specialty Homes paid that money by way of St. Michael's so that the church could take 10% of it as a small donation.  (Resp. at 8.)

Plaintiff points out that, from October of 2001 to May of 2004, Specialty Homes paid over $53,000 to Dolce Vita, a restaurant in Monroe, Michigan, that Defendants own.  (Mot. at 5; Pl.'s Ex. 11.)  Defendants claim that some of the $53,000 payment to Dolce Vita was for business luncheons with clients and prospective clients at the restaurant.  (Resp. at 8.)  In fact, Plaintiff testified that she had attended these business lunches at Dolce Vita.  (2/18/05 Tr. at 64.)  However, Plaintiff also testified that such business lunches could not have amounted to $53,000.  (*Id.*)  Indeed, Defendants claim that some unspecified portion of the $53,000 payment comprised checks that the restaurant cashed so that Specialty Homes could pay certain tradesmen in cash.[4]  (Resp. at 9.)  Defendants claim that $5,000 of the $53,000 payment to Dolce Vita was a loan to the restaurant, and that Specialty Homes' financial records document this loan, which is still owing.  (*Id.*)

Plaintiff testified that Defendants paid a personal line of credit from Specialty Homes' account.  (2/18/05 Tr. at 26, 58; Pl.'s Ex. 13.)  Plaintiff further testified that, as evident from the account statements, Defendants used a Visa credit card in the name of Specialty Homes for various personal expenditures.  (2/18/05 Tr. at 27.)  For example, Plaintiff testified to the

---

[4] While Defendants concede that this was "not the best way of doing business," they maintain that Plaintiff was well-aware that Dolce Vita was cashing such checks so that Specialty Homes could pay its tradesmen in this manner and that Plaintiff signed many such checks.  (*Id.* at 9-10, 13.)  Plaintiff testified that, while she had the authority to sign checks on behalf of Specialty Homes, she only signed such checks pursuant to Defendants Giuseppe and Antonio Cangialosi's direction and authorization.  (2/18/05 Tr. at 42-43.)

following payments that were not, to her knowledge, business-related: 1) $343.67 to the Elder-Beerman Department Store; 2) $1,140 to Bozzo's Limousine Service; 3) $660.51 to Red Falcon Fireworks; 4) $1,437.07 to Vision of the Seas cruise ship.  (*Id.* at 29-31, 60; Pl.'s Ex. 15.) Plaintiff also testified to non-business-related purchases at Dilliards Department Store, at various jewelry shops, and from Alitalia Air Lines.  (2/18/05 Tr. at 30, 60; Pl.'s Ex. 15.)

Plaintiff asserts that Defendants have attempted to exclude Plaintiff from participating in and fully benefitting from Specialty Homes' operation.  For example, Plaintiff contends that Specialty Homes has distributed profits, including a recent $200,000 distribution, to Defendants without providing Plaintiff with any notice or documentation.  (Compl. at ¶ 25.)  Conceding that Plaintiff, as a shareholder, is to partake of any profits accruing from the sale of houses that Specialty Homes constructed, Defendants argue that Specialty Homes has paid Plaintiff "more than her fair share of the profits from the company."[5]  (Resp. at 13.)  Yet, Plaintiff testified that, although she received a $20,000 distribution from the sale proceeds of houses that Specialty Homes constructed in South Pointe Condominiums (2/18/05 Tr. at 58-59.), Defendant Giuseppe Cangialosi told her that she would not receive any of the sale proceeds of houses that Specialty Homes constructed in Cypress (*Id.* at 48, 52.).  Plaintiff testified that she never received the total distributions owing to her.  (*Id.* at 59.)  Indeed, Plaintiff further testified that an employee of Defendant Anthony Sacco warned her that Defendants Giuseppe, Antonio, and Barbara Cangialosi inquired about how they could remove Plaintiff as a shareholder from Specialty Homes without having to pay her. (*Id.* at 66.)

The Court finds that, based upon the evidence presented to the Court, thus far, Plaintiff

---

[5]Specifically, Defendants argue, without evidentiary support, that Specialty Homes paid Plaintiff $72,413.60 for her 15% interest in the company, and that such a payout exceeds that which the majority shareholders received. (Resp. at 11-12.)

8

has demonstrated that Defendants engaged in fraudulent conduct. Specifically, the Court finds overwhelming evidence that Defendants have misappropriated Specialty Homes' assets and corporate opportunities in its business of real-estate construction.

### B.  Risk of Irreparable Harm to Plaintiff

As to the risk of irreparable harm to Plaintiff's interest in Specialty Homes absent a receivership, Plaintiff contends that, should the Court not appoint a receiver, Defendants will continue to misappropriate Specialty Homes' funds and business opportunities for personal gain. (Mot. at 5, 7.)  As Plaintiff aptly underscores, houses that Specialty Homes constructed are currently being advertised under the name of Casa. (*Id.* at 5-6.)  Defendants concede that houses that Specialty Homes constructed have signs advertising for Casa. (Resp. at 13.)  Anyone who is interested in hiring Specialty Homes as a builder is, therefore, directed to Casa, a competing builder. (Feb. 18, 2005, Tr. at 8, 15, 17, 21, 50; Pl.'s Exs. 6, 7, 9.)

Based upon the overwhelming evidence that Defendants are misappropriating Specialty Homes' assets and business opportunities, the Court finds that Plaintiff has demonstrated that, absent the appointment of a receiver to manage Specialty Homes' operation, Plaintiff's interest in Specialty Homes is in imminent danger of being "lost, concealed, injured, diminished in value, or squandered." 12 Wright & Miller, *Federal Practice and Procedure* § 2983 at 25-26 (1973).

### C.  Adequate Legal Remedies

According to Defendants, Plaintiff has failed to demonstrate that, if she were to obtain a monetary judgment against Defendants upon the disposition of her lawsuit, Defendants would be financially unable to pay that judgment. (Resp. at 2.)  Defendants underscore that Specialty Homes is financially solvent. Defendants argue that, therefore, Plaintiff's legal remedies would

be adequate to protect her interest in Specialty Homes.

Plaintiff testified that, if Defendants continue to misappropriate Specialty Homes' corporate opportunities, Specialty will run out of business and will cease to operate, thereby making it impossible to accomplish the purpose for which it was organized. (Feb. 18, 2005, Tr. at 7-8.) Based upon the evidence before the Court at this time, the Court agrees, and concludes that, absent the appointment of a receivership, any legal remedies available to Plaintiff would be inadequate to protect her interest in Specialty Homes.

### D.  Balance of Interests

As to whether the harm to Plaintiff absent a receivership would outweigh the harm to Defendants from a receivership, Defendants simply argue that a receivership would harm them by diminishing the "thriving business" that they have built in the community. (Resp. at 3.) Yet, the very thrust of Plaintiff's lawsuit–as well as the proffered evidence–is that Defendants are, in effect, running Specialty Homes into the ground by misappropriating its business opportunities and assets. The Court finds that this factor militates in favor of appointing a receiver to manage Specialty Homes' operation.

### E.  Likelihood of Success on the Merits

Defendants, in their response, challenge Plaintiff's likelihood of success on the merits on the ground that only Plaintiff's self-serving complaint corroborates Defendants' alleged wrongdoing, which Defendants themselves deny. (Resp. at 3.) However, Plaintiff presented ample evidence to substantiate her claim of Defendants' misappropriation at the evidentiary hearing. Defendants presented no contrary evidence. Thus, only Defendants' position rests on self-serving allegations. The Court finds that Plaintiff has demonstrated a strong likelihood of success on the merits of her state-law claim of misappropriation.

## IV. SUMMARY

The Court finds that a balance of the relevant factors counsels in favor of appointing a receiver to manage Specialty Homes during the pendency of the instant litigation. The Court, therefore, GRANTS Plaintiff's motion for such an appointment.

SO ORDERED.

                                            s/Paul D. Borman
                                            PAUL D. BORMAN
                                            UNITED STATES DISTRICT JUDGE

Dated:  June 13, 2005

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on June 13, 2005.

                                            s/Jonie Parker
                                            Case Manager